# United States Court of Appeals for the Federal Circuit

---

**NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant*

---

2019-1081, 2019-1083

---

Appeals from the United States District Court for the District of Columbia in No. 1:16-cv-00745-ESH, Judge Ellen S. Huvelle.

---

Decided: August 6, 2020

---

DEEPAK GUPTA, Gupta Wessler PLLC, Washington, DC, argued for plaintiffs-appellants. Also represented by JONATHAN TAYLOR; WILLIAM H. NARWOLD, Motley Rice LLC, Hartford, CT; MEGHAN OLIVER, Mt. Pleasant, SC.

ALISA BETH KLEIN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-cross-appellant. Also represented by MARK B. STERN, ETHAN P. DAVIS.

SEAN MAROTTA, Hogan Lovells US LLP, Washington, DC, for amici curiae W. Royal Furgeson, Jr., Nancy Gertner, Brian L. Owsley, Viktor V. Pohorelsky, Shira Ann Scheindlin, Stephen W. Smith, Richard A. Posner.  Also represented by STEPHEN SCHULTZE, CLAUDIA PARE.

PHILLIP R. MALONE, Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic, Stanford Law School, Stanford, CA, for amici curiae Casetext, Docket Alarm, Fastcase, Free Law Project, Internet Archive, Judicata, Mark A. Lemley, Ravel, Syntexys, UniCourt.

BRUCE D. BROWN, The Reporters Committee for Freedom of the Press, Arlington, VA, for amici curiae The Reporters Committee for Freedom of the Press, American Society of Newspaper Editors, Associated Press Media Editors, Association of Alternative News Media, First Amendment Coalition, First Look Media Works, Inc., International Documentary Association, Investigative Reporting Workshop, MPA, National Press Photographers Association, Online News Association, Radio Television Digital News Association, Reporters Without Borders, Seattle Times Company, Society of Professional Journalists, Tully Center for Free Speech, Bay Area News Group, BuzzFeed, California News Publishers Association, Freedom of the Press Foundation, The Media Institute, The National Press Club, National Press Club Journalism Institute, New York Times Company, PEN America, POLITICO LLC, Reveal from the Center for Investigative Reporting, Sinclair Broadcast Group, Inc.

ELIZABETH WYDRA, Constitutional Accountability Center, Washington, DC, for amicus curiae Joseph I. Lieberman.

BRETT MAX KAUFMAN, Center for Democracy, American Civil Liberties Union Foundation, New York, NY, for amici curiae American Association of Law Libraries, American

Civil Liberties Union, American Library Association, Cato Institute, Knight First Amendment Institute at Columbia University.

———————————

Before LOURIE, CLEVENGER, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

These interlocutory cross-appeals challenge the district court's interpretation of a statutory note to 28 U.S.C. § 1913 permitting the federal judiciary to charge "reasonable fees" for "access to information available through automatic data processing equipment." Plaintiffs contend that under this provision unlawfully excessive fees have been charged for accessing federal court records through the Public Access to Court Electronic Records (PACER) system and that the district court identifies too little unlawful excess. The government argues that the district court identifies too much (and also that the district court lacked jurisdiction). We conclude that the district court got it just right. We therefore affirm and remand for further proceedings.

I

The statutory note at issue follows the section text of 28 U.S.C. § 1913 and provides in relevant part:

COURT FEES FOR ELECTRONIC ACCESS TO INFORMATION

. . . .

"(a) The Judicial Conference may, only to the extent necessary, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment. These fees may distinguish

between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. [§] 612(c)(1)(A) to reimburse expenses incurred in providing these services."

28 U.S.C. § 1913 note (2012) (§ 1913 Note).[1]

To briefly introduce the players referenced, the Administrative Office of the United States Courts (AO) is an agency within the judicial branch that provides a broad range of support services to federal courts; and the Judicial Conference is the national policymaking body for the federal courts, made up of the Chief Justice and certain federal judges from each judicial circuit, *see* 28 U.S.C. § 331. These two bodies act in concert, with the AO advising and supporting the Judicial Conference, and developing the

---

[1] That this text appears as a statutory note, rather than as section text, is "of no moment." *Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004).

annual judiciary budget for congressional approval, with input from the Judicial Conference.

Congress passed the original version of § 1913 Note in the early 1990s soon after the Judicial Conference, in 1988, first authorized an "experimental program of electronic access for the public to court information." REPORT OF THE PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES 83 (Sept. 14, 1988) (1988 JUD. CONF. REP.)[2]; J.A. 2903. This "experimental program" eventually grew into the PACER system used today for online access to federal court dockets and case records. *See* Judiciary Appropriations Act, 1991, Pub. L. No. 101-515, § 404, 104 Stat. 2101, 2132–33 (1990); Judiciary Appropriations Act, 1992, Pub. L. No. 102-140, § 303, 105 Stat. 782, 810 (1991). Section 1913 Note was last amended by the E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (2002). Before PACER's advent, federal court dockets and filings were all on paper. If members of the public wanted to view those records, they had to travel to the courthouse to request access. PACER revolutionized public access to federal courts by making dockets and electronic case records viewable from any web-connected computer.

Since PACER's inception, the Judicial Conference has charged fees for its use because Congress has never appropriated funds to cover the cost of PACER operations. J.A. 2589, 2632. Although the federal judiciary is an independent branch of government, it depends largely on appropriations of taxpayer dollars from Congress in order to function. *See, e.g.*, J.A. 455–2351 (excerpts of Financial Services and General Government Appropriations budget requests to the House Committee on Appropriations).

---

[2]    This and other Reports of Proceedings for the Judicial Conference are available online at https://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference-us.

Annual appropriations for the judiciary cover judge and staff salaries, federal defender services, courthouse security, and juror payments, among other things. But the judiciary can also self-fund certain services and operations by charging fees to the public for using them. PACER has operated as one of these self-funded services.

When PACER was only accessible by dial-up phone connection,[3] fees were charged by the minute. Once PACER moved to a web interface in 1998, the Judicial Conference started charging users $0.07 per page for downloads and printing—which increased to $0.10 per page in 2012—subject to certain exemptions, waivers, and caps. The applicable fees are listed in a periodically updated Electronic Public Access (EPA) Fee Schedule (available at https://www.uscourts.gov/services-forms/fees/electronic-public-access-fee-schedule) in accordance with § 1913 Note, paragraph (a).[4] During the period relevant to this litigation, the Judicial Conference used these PACER fees to

---

[3]    "Users with dial-in telephone modems . . . could receive docket sheet information, and see thumbnail case summaries on their computer screens." U.S. COURTS, *25 Years Later, PACER, Electronic Filing Continue to Change Courts* 3 (Dec. 9, 2013), https://www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts (*25 Years of PACER*).

[4]    Fees for downloading documents via PACER ("PACER fees") are one of three categories of EPA fees, alongside charges for printing copies of records accessed electronically at a courthouse public terminal, and various PACER Service Center charges. J.A. 2522. Because the courthouse printing and Service Center fees constitute only a fraction of a percent of the revenue collected in PACER fees, though, we refer to PACER fees and EPA fees interchangeably.

fund six EPA programs and projects in addition to funding the operation of PACER itself:

1. ***Case Management and Electronic Case Filing (CM/ECF) System***. As will be explained in more detail, the judiciary started developing CM/ECF in the late 1990s as a counterpart to PACER. As today's practitioners are well-aware, CM/ECF enables attorneys and self-represented parties to file and update court records electronically over the internet; it also allows clerk's offices to maintain completely electronic case files and dockets. There are no added fees for filing documents using CM/ECF, beyond the standard court filing fees. Non-parties accessing electronically filed documents, however, must use PACER and pay any applicable PACER fees.

2. ***Electronic Bankruptcy Noticing (EBN)***. EBN is a free service provided by U.S. Bankruptcy Courts that electronically transmits court-generated bankruptcy notices to parties listed in the case. These notices were previously transmitted by mail.

3. ***State of Mississippi Study***. This program was a three-year feasibility study that involved sharing CM/ECF software and federal court documents with the State of Mississippi to provide electronic public access to Mississippi state court documents.

4. ***Violent Crime Control Act (VCCA) Notification System***. The VCCA Notification system electronically notifies local police when new court documents are filed in cases of federal offenders under supervised release.

5. ***Web-Based Juror Services***. The federal juror management system, "E-Juror," provides prospective jurors with electronic copies of court documents regarding their jury service.

6. ***Courtroom Technology***. Courtroom Technology funds cover the maintenance, replacement, and upgrade of courtroom technology, including equipment used for electronically presenting evidence to courtroom audiences as well as digital audio recording equipment.

## II

In April 2016, plaintiffs—three national nonprofit organizations that have downloaded public court records via PACER—brought a class action against the United States, alleging that the incurred PACER fees "exceeded the amount that could lawfully be charged" under § 1913 Note because the fees did not reflect the cost of operating PACER alone. J.A. 87 ¶ 34. Plaintiffs alleged that each individual download of a public record for which they were charged gave rise to a separate "illegal exaction" claim— that is, a claim that money was "improperly paid, exacted, or taken from the claimant" in violation of law, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005). J.A. 75, 87 ¶ 34. Asserting subject-matter jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346, plaintiffs sought the "return or refund of the excessive PACER fees" collected over the previous six years, from 2010 to 2016.[5] J.A. 77 ¶ 5; J.A. 87 ¶ 34.

In January 2017, after denying the government's motion to dismiss, the district court certified an opt-out class consisting of all individuals and entities who had paid PACER fees between April 21, 2010, and April 21, 2016, excluding federal government entities and present class counsel. And the court certified one class claim: "that the fees charged for accessing court records through the PACER system are higher than necessary to operate

---

[5]    *See* 28 U.S.C. § 2401(a) (setting a six-year statute of limitations for civil actions against the United States).

PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act." J.A. 2354.

After some limited informal discovery, the parties filed cross-motions for summary judgment regarding liability. Plaintiffs interpreted § 1913 Note as prohibiting the judiciary "from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER." *Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 139 (D.D.C. 2018) (*Summary Judgment Opinion*) (quoting plaintiffs' motion). The government, by contrast, argued that the statute allows the judiciary to use PACER fees "to fund the dissemination of information through electronic means." *Id.* at 140 (quoting motion hearing transcript).

The district court adopted neither of these extremes. Instead, after thoroughly charting the legislative history of § 1913 Note against the backdrop of the judiciary's development of PACER and CM/ECF, the court determined that § 1913 Note limited "the use of PACER fees to expenses incurred in providing services, such as CM/ECF and EBN, that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system." *Id.* at 149. Accordingly, the court decided that the federal judiciary properly used PACER fees to pay for the costs of operating CM/ECF and EBN; but that it should not have used PACER fees to pay for the Mississippi Study, VCCA Notification, Web-Based Juror Services, and most of the expenditures for Courtroom Technology. *Id.* at 145–46, 149–50.

The district court denied plaintiffs' motion for summary judgment as to liability—while finding the government liable for the above four expenditures—and granted-in-part and denied-in-part the government's cross-motion. *Id.* at 140, 151. At the parties' request, the court later

certified the summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b) and stayed further proceedings. *Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150 (D.D.C. 2018). With our permission, *see Nat'l Veterans Legal Servs. Program v. United States*, No. 2018-154 (Fed. Cir. Oct. 16, 2018), Dkt. No. 9, the parties filed these cross-appeals. We have jurisdiction under 28 U.S.C. § 1292(b), (c)(1).

## III

We first address the government's argument that we should vacate the summary judgment order because the district court lacked Little Tucker Act jurisdiction over the case. Specifically, the government contends that the trial court lacked jurisdiction over plaintiffs' illegal exaction claim because § 1913 Note does not provide a cause of action with a monetary remedy. We disagree.

"Whether a district court has subject matter jurisdiction over an action is a question of law that we review *de novo*." *De Archibold v. United States*, 499 F.3d 1310, 1313 (Fed. Cir. 2007). We may resolve this jurisdictional issue for the first time on appeal.[6] *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998).

"District courts have jurisdiction under the Little Tucker Act to hear claims 'against the United States, not exceeding \$10,000[.]'" *Corr v. Metro. Washington Airports Auth.*, 702 F.3d 1334, 1336 (Fed. Cir. 2012) (quoting 28 U.S.C. § 1346(a)(2)). Because the Little Tucker Act itself is simply a jurisdictional statute, we must determine

---

[6] In its motion to dismiss, the government offered a version of its present jurisdictional argument (that § 1913 Note does not provide a monetary remedy) as one of several reasons the district court should dismiss the complaint. But the district court did not directly address that argument in denying the motion.

whether the only other federal provision alleged—§ 1913 Note—"confer[s] a substantive right to recover money damages from the United States." *United States v. Testan*, 424 U.S. 392, 398 (1976).

Plaintiffs' theory of jurisdiction rests on their "illegal exaction" claim that the government unlawfully charged them excessive PACER fees and must return the amount found to exceed the marginal cost of operating PACER during the period in question. Illegal exaction claims are one of two classes of non-contract claims over which the Little Tucker Act provides district court jurisdiction.[7] *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Both rest on the principle that to invoke (Little) Tucker Act jurisdiction, the plaintiff must identify a statute, or other source of federal law, entitling her to receive money from the government. But the two classes of non-contract claims demonstrate that entitlement through different routes. In the illegal exaction class of claims, "the plaintiff has paid money over to the [g]overnment, directly or in effect, and seeks return of all or part of that sum." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (en banc). The classic example of an illegal exaction claim is a tax refund suit. *Norman*, 429 F.3d at 1095. The second class of non-contract claims—commonly coined "money-mandating"—involves "demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a

---

[7]     The Little Tucker Act follows the same rules as its bigger sibling, the Tucker Act, 28 U.S.C. § 1491(a)(1), which assigns jurisdiction exclusively to the Court of Federal Claims regardless of the monetary amount claimed. *United States v. Bormes*, 568 U.S. 6, 10 n.2 (2012); *Evans v. United States*, 694 F.3d 1377, 1379 n.5 (Fed. Cir. 2012). This opinion therefore discusses jurisdictional decisions under both statutes interchangeably.

payment from the treasury" for some covered type of injury. *Eastport S.S.*, 372 F.3d at 1007. Because in this second class of claims no money is alleged to have been ceded improperly to the government in the first place, plaintiffs are required to identify a "money-mandating" statute (or other source of federal law) authorizing monetary damages for its violation in order to invoke Little Tucker Act jurisdiction. *Ontario Power*, 369 F.3d at 1301; *see Eastport S.S.*, 372 F.3d at 1007. For example, suits against the government for disability retired pay and wrongful dismissal actions for back pay fall in this second class of claims requiring a "money-mandating" source. *Eastport S.S.*, 372 F.3d at 1008.

The above two classes of Little Tucker Act claims are flip sides of the same coin: the illegal exaction class comprises claims for the return of money collected in the "absence of statutory authorization" while the money-mandating class comprises claims for money "founded on statutory authority." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1579 (Fed. Cir. 1996) (Nies, J., concurring). Both require a statute or other federal source beyond the Tucker Act itself. But illegal exaction claims assert the statute's prior improper use as a basis to recover money paid; money-mandating claims ask the court to apply the statute in the first instance to award damages. *See Ontario Power*, 369 F.3d at 1301 (distinguishing illegal exaction claims from money-mandating claims, and specifying that claims in the money-mandating category "require that the 'particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum'" (quoting *Eastport S.S.*, 372 F.2d at 1007)); *see also Martinez v. United States*, 333 F.3d 1295, 1302–03 (Fed. Cir. 2003) (en banc) (describing Tucker Act authority for both "actions to recover illegal exactions" and "actions brought pursuant to money-mandating" sources).

Despite this long-recognized distinction, the government here argues that plaintiffs' illegal exaction claim fails

because its statutory source, § 1913 Note, does not provide a cause of action for damages. Essentially attempting to inject a money-mandating requirement into the illegal exaction class of Little Tucker Act claims, the government relies on the following language from *Norman*: "To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). And according to the government, § 1913 Note does not expressly or impliedly provide for a return of any excess fees to PACER users.

The government argues that, based on *Norman*, a money-mandating statute is required for illegal exaction claims just as it is for money-mandating claims. We need not decide whether that is true because in this case the statute does provide "by necessary implication" that the remedy for its violation is the return of money unlawfully exacted. *Norman*, 429 F.3d at 1095 (internal quotation marks omitted). We acknowledge that § 1913 Note nowhere explicitly requires payment of damages by the government for overcharging users. But because § 1913 Note is a fee-authorizing statute, and the government is alleged to have illegally collected more than the authorized fee, the necessarily implied remedy for any violation through overcharging is that the government must return the excess fees collected. *See Norman*, 429 F.3d at 1095; *Cyprus Amax*, 205 F.3d at 1373. When the government "'has the citizen's money in its pocket,'" the Tucker Act permits suit "to recover the money exacted." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) (quoting *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954)).

We need not decide that an illegal exaction claim is the *default* remedy for misuse of a fee-imposing statute. In this

case, however, the illegal exaction claim possesses all the basic elements for Little Tucker Act jurisdiction: a non-tort claim against the United States pursuant to a federal source of law whose violation entitles the plaintiff to money from the government.[8]  In this case, where the statute authorizes the government to collect a fee for certain purposes, and it is alleged that the government collected fees in excess of the statutory authorization, the "necessary implication" is that the fees can be recovered through an illegal exaction claim.  There is no need to find a separate express money damages provision in the fee-authorizing statute for a plaintiff to proceed under the (Little) Tucker Act.  *See Aerolineas*, 77 F.3d at 1573–74.

The sole certified class claim here asserts that the value sued for—the excessive PACER fees remitted[9]—was improperly collected in contravention of a statute, namely § 1913 Note.  J.A. 87 ¶ 34; J.A. 2354.  Plaintiffs' complaint accordingly states a claim over which the district court had jurisdiction under the Little Tucker Act.  *See N.Y. Life Ins. Co. v. United States*, 118 F.3d 1553, 1556 (Fed. Cir. 1997); *Eastport S.S.*, 372 F.2d at 1007.

---

[8]    Of course, plaintiffs also must plausibly allege that the exaction was truly *due to* a misapplication of the statute identified as having been violated.  *See Ontario Power*, 369 F.3d at 1303 ("[T]he government is considered to have illegally exacted money from a plaintiff only where the government's actions . . . have a direct and substantial impact on the plaintiff . . . ." (internal quotations omitted)).  But no causality problems are raised in this appeal.

[9]    We reject the government's argument that, to confer jurisdiction, the complaint must identify precisely the amount each plaintiff has individually overpaid.

IV

Turning to the merits, the only issue presented in the main appeal is one of statutory interpretation, as neither party has identified any material disputed factual issues at this stage. We review de novo the district court's statutory interpretation. *BASR P'ship v. United States*, 915 F.3d 771, 776 (Fed. Cir. 2019). "We focus our inquiry on the statutory language." *Id.* Our "first step 'is to determine whether the language at issue has a plain and unambiguous meaning.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). In making this assessment, we secondarily consider the surrounding legislative history and principles of constitutional avoidance.

A

On appeal, the parties reassert basically the same textual arguments presented to the district court. Plaintiffs argue that the plain language of § 1913 Note unambiguously prohibits setting PACER fees above the amount necessary to recover the costs of providing access to records via PACER. Drawing from various portions of the text, plaintiffs read § 1913 Note to authorize fees "only to the extent necessary" "to reimburse expenses incurred in providing" the "services rendered" (i.e., PACER access) in exchange for the fees. Appellants' Br. 24–26 (quoting § 1913 Note). In other words, they say, "PACER fees must be limited to PACER costs." *Id.* at 2. In plaintiffs' view, the district court thus erred by interpreting § 1913 Note to allow setting PACER fees high enough to cover the costs of operating CM/ECF, EBN, and courtroom audio recording equipment in addition to PACER operating costs.

The government maintains its opposing construction, drawn primarily from the statute's opening sentence, that § 1913 Note authorizes setting fees to the extent necessary "for access to information available through automatic data

processing equipment."[10]  Government's Opening Br. 26
(quoting § 1913 Note).  According to the government, the
district court erred by limiting the permissible costs cover-
able by PACER fees to only the above three programs—be-
cause the four remaining disallowed programs were also
services that provide electronic access to information.

We do not accept either party's reading.  Instead, we
agree with the district court's interpretation that § 1913
Note limits PACER fees to the amount needed to cover ex-
penses incurred in services providing public access to fed-
eral court electronic docketing information.

Plaintiffs overread the statutory text while the govern-
ment underreads it.  Plaintiffs arrive at their textual inter-
pretation by combining several phrases from opposite ends
of § 1913 Note.  They combine part of the first sentence of
paragraph (a) ("The Judicial Conference may, only to the
extent necessary, prescribe reasonable fees . . . .") with two
parts of the last sentence of paragraph (b) ("to reimburse
expenses incurred in providing" the "services rendered,"
which plaintiffs construe to mean PACER access), paying

---

[10]  We understand "access to information available
through automatic data processing equipment" to mean, in
modern parlance, "electronic access to information."  At the
time of § 1913 Note's enactment, "automatic data pro-
cessing equipment" was defined as "any equipment or in-
terconnected system or subsystems of equipment that is
used in the automatic acquisition, storage, manipulation,
management, movement, control, display, switching inter-
change, transmission, or reception, of data or information."
*Summary Judgment Opinion*, 291 F. Supp. 3d at 128 n.4
(discussing 28 U.S.C. § 612(k) (1990) and 40 U.S.C.
§ 759(a)(2)(A) (1990)).  Both the district court and the gov-
ernment have treated the phrase, as we do, to mean elec-
tronic access to information, and plaintiffs do not contest
this definition.

little heed to the substantial amount of text in between. This seems to us an odd way to read a statute.

By focusing on the "only to the extent necessary" portion of the first sentence of paragraph (a), plaintiffs fail to address the significance of the remainder of the sentence, which reads in relevant part: "The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . *for access to information available through automatic data processing equipment*." § 1913 Note para. (a) (emphasis added). Read on its own, and in its entirety, this sentence does not suggest any specific restriction on what expenses these fees may cover. As plaintiffs point out, the phrase "only to the extent necessary" markedly omits any object, leaving us to wonder: "only to the extent necessary" *to what*? Plaintiffs direct us to the very end of paragraph (b) to answer that question: only to the extent necessary "to reimburse expenses incurred in providing" PACER access. But, again, we are unpersuaded that Congress would bury the object of a restriction so far from the allegedly restrictive prefatory text. Looking at paragraph (b) in full confirms the incorrectness of plaintiffs' reading. The final sentence reads, as relevant: "All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund . . . to reimburse expenses incurred in providing these services." § 1913 Note para. (b). This sentence simply conveys that any EPA services will be at least somewhat self-funded; it does not limit the amount of fees to be imposed or the type of rendered EPA service to be "offset[]."

Plaintiffs also argue that the E-Government Act of 2002's amendment of § 1913 Note requires that we read the statute to restrict PACER fees from exceeding the amount necessary to offset PACER costs. Before the 2002 amendment, the first sentence of paragraph (a) read: "The Judicial Conference *shall hereafter* prescribe reasonable fees . . . for access to information available through

automatic data processing equipment." 28 U.S.C.
§ 1913 note (Supp. V 1988) (emphasis added). Sec-
tion 205(e) of the E-Government Act, entitled "Cost of
Providing Electronic Docketing Information," replaced the
phrase "shall hereafter" so that the first sentence would
read, as it now does: "The Judicial Conference *may, only to
the extent necessary*, prescribe reasonable fees . . . ."
28 U.S.C. § 1913 note (2012) (emphasis added); *see* Pub. L.
No. 107-347, § 205(e), 116 Stat. 2899, 2915 (2002). Plain-
tiffs urge that the only way to give meaning to the new
phrase "only to the extent necessary" is to understand it as
limiting the scope of the fee authorization. Appellants'
Br. 28–29, 41–42 ("When Congress acts to amend a statute,
we presume it intends its amendment to have real and sub-
stantial effect." (quoting *Ross v. Blake*, 136 S. Ct. 1850,
1858 (2016) (alterations removed in original))).

We disagree. By its plain text, the amendment simply
changed the fee structure from a mandatory to a permis-
sive scheme. Whereas the judiciary previously was re-
quired to charge fees for electronic access to court
information, after the 2002 amendment it could choose
whether to do so. The language "only to the extent neces-
sary" certainly suggests that Congress sought to encourage
the judiciary to limit its imposition of such fees—since oth-
erwise the amendment could have simply swapped "shall"
for "may." But, as we continue to stress, the text lacks a
clear object or purpose of the supposed limitation ("only to
the extent necessary" *to what*?) and we are unwilling to
supply one of our own—or one of plaintiffs'—making. If
Congress had intended to limit fees only to the extent nec-
essary *to reimburse expenses incurred in providing access
to PACER*, it would have said so more clearly. We can give
full effect to the 2002 amendment by reading it as removing
the electronic access fee obligation and encouraging the ju-
diciary to rein in fees—without imparting any specific lim-
itation on the fee-setting.

But the government's textual arguments stray too far in the other direction. We reject the government's proposed textual interpretation of § 1913 Note as authorizing fees to cover costs related to *any* electronic court access service or program. The opening sentence of paragraph (a), on its own, supports the government's interpretation, as it authorizes charging fees for electronic access to information without any express restrictions. Reading that sentence within the context of § 1913 Note as a whole, and against the legislative history surrounding its enactment and amendment, however, leads us to affirm the two limitations the district court identified: Section 1913 Note limits the use of PACER fees to expenses incurred in providing (1) electronic access for *members of the public* (2) to information stored on a *federal court docketing system*. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 149.[11]

B

The district court thoroughly charted the development of PACER and CM/ECF against the backdrop of numerous congressional appropriations acts and committee reports, as well as the E-Government Act. We summarize the most relevant portions of that timeline with a few additions.

In 1988, the Judicial Conference authorized the PACER pilot program in several bankruptcy and district courts—described as "an experimental program of electronic access for the public to court information." 1988 JUD. CONF. REP. at 83; J.A. 2903. Two years later, Congress

---

[11] To the extent the government maintains its argument that paragraph (b)'s directive to deposit the fees in the Judiciary Automation Fund (now the Judiciary Information Technology Fund), 28 U.S.C. § 612, dictates the broad use of those fees, we reject this argument for the reasons explained by the district court. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 143.

enacted the first version of the predecessor to § 1913 Note. Judiciary Appropriations Act, 1991, Pub. L. No. 101-515, § 404, 104 Stat. 2101, 2132–33 (1990).[12]  The accompanying Senate Committee on Appropriations report stated that § 404 of the Act "authorizes the Judicial Conference to prescribe reasonable fees for public access to case information, to reimburse the courts for automating the collection of the information." S. REP. NO. 101-515, at 86 (1990).

In 1992, PACER expanded to additional district and bankruptcy courts.  J.A. 2589.  That summer, the House Committee on Appropriations noted that "the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media," with more than 75 courts providing this service, and mostly for free.  H.R. REP. NO. 102-709, at 58 (1992).  The Committee "request[ed] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so," in accordance with § 1913 Note.  *Id.*

In 1995, the Judicial Conference approved changes in the federal rules to permit the electronic filing of case documents.  Peter W. Martin, *Online Access to Court Records—from Documents to Data, Particulars to Patterns*, 53 VILL. L. REV. 855, 861 n.26 (2008).  In 1996, a few federal courts began experimenting with systems for electronic filing.  ADMIN. OFFICE OF THE U.S. COURTS, ELECTRONIC CASE FILES IN THE FEDERAL COURTS: A PRELIMINARY

---

[12]   The initially enacted language was not added to the U.S. Code.  An appropriations act the following year supplied the almost identical language that was codified at § 1913 note.  Judiciary Appropriations Act, 1992, Pub. L. No. 102-140, § 303, 105 Stat. 782, 810 (1991); 28 U.S.C. § 1913 note (Supp. V 1988).

EXAMINATION OF GOALS, ISSUES, AND THE ROAD AHEAD (discussion draft) vii, 4 (1997).  That year's House and Senate appropriations committee reports lauded the judiciary's efforts to enhance electronic public access while emphasizing that these efforts were to be funded via EPA fees.  *See* H.R. REP. NO. 104-676, at 89 (1996) ("The Committee supports the ongoing efforts of the Judiciary to improve and expand information made available in electronic form to the public. Accordingly, the Committee expects the Judiciary to utilize available balances derived from electronic public access fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information."); S. REP. NO. 104-353, at 88 (1996) ("The Committee supports efforts of the judiciary to make electronic information available to the public, and expects that available balances from public access fees in the judiciary automation fund will be used to enhance availability of public access.").  The House appropriations committee specifically suggested "enhancements such as electronic case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy noticing."  H.R. REP. NO. 104-676, at 89.

The development of the CM/ECF case management and e-filing system continued throughout the late 1990s, with the national rollout carrying through the early 2000s. In 1998, the judiciary developed a web interface for PACER and set a $0.07 per page fee for accessing case filings over the internet.  J.A. 2589.  In 2002, 11 district courts and 40 bankruptcy courts were using CM/ECF.  *25 Years of PACER*.

In December 2002, Congress passed the E-Government Act, sponsored by Senator Joseph Lieberman.  Pub. L. No. 107-347, 116 Stat. 2899 (2002).  The E-Government Act's stated purpose was "[t]o enhance the management and promotion of electronic Government services and processes," in part by requiring use of "Internet-based

information technology to enhance citizen access to Government information and services." 116 Stat. 2899 (title). Section 205 of the Act set several new requirements for federal courts: to create and regularly maintain court websites providing (among other things) access to "docket information" for each case; and to "make any document that is filed electronically publicly available online," subject to certain exceptions. § 205(a)–(c), 116 Stat. at 2913–14. It also required the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filings, decisions, and rulings in each case to be obtained from the docket sheet of that case." § 205(d), 116 Stat. at 2915. In its final substantive subsection directed to the judiciary, entitled "Cost of Providing Electronic Docketing Information," the E-Government Act amended § 1913 Note, as discussed above, to make EPA fees permissive rather than mandatory. § 205(e), 116 Stat. at 2915.

The accompanying Senate Governmental Affairs Committee Report stated that by amending § 1913 Note, *see* § 205(e), the Committee "intend[ed] to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." S. REP. NO. 107-174, at 23 (2002). The Committee then cited PACER as an example of a public access service where, under existing law, users were being "charged fees that are higher than the marginal cost of disseminating the information." *Id.*

Still, the next year's congressional appropriations committee reports expressed support for CM/ECF along with an expectation that it would be funded by EPA fees. *See* H.R. REP. NO. 108-221, at 116 (2003) ("The Committee expects the fee for the [EPA] program to provide for [CM/ECF] system enhancements and operational costs."); S. REP. NO. 108-144, at 118 (2003); 149 CONG REC. H12323,

at H12515 (daily ed. Nov. 25, 2003) (adopting by reference the House report statement on EPA fees).  So, in 2004, the Judicial Conference increased PACER fees from $0.07 per page to $0.08 per page to cover the cost of implementing and maintaining CM/ECF nationwide.  J.A. 2598 (EPA Fee Schedule Change Memorandum).

Eventually, the judiciary found itself with a surplus in EPA fees and informed Congress that it planned to expand its use of those funds beyond PACER and CM/ECF to other "public access initiatives."  J.A. 3090 (FY 2007 Financial Plan); *see Summary Judgment Opinion*, 291 F. Supp. 3d at 134.  In addition to submitting annual budget requests to Congress for judiciary appropriations, the AO also annually submits its "Financial Plans" for each fiscal year.[13] *See, e.g.*, J.A. 3090–98 (Financial Plan excerpts); ECF No. 81.1[14] (2d Skidgel Decl.), Tabs 1–13 (budget request and Financial Plan excerpts).  The House and Senate appropriations committees, or members of their staffs, typically respond to the Financial Plans by letter or email conveying the committee's approval and/or concerns.

Beginning in fiscal year 2007, the AO's Financial Plans indicated that the judiciary would use EPA fees to fund various projects and programs beyond PACER and CM/ECF.  *See* J.A. 3090; *Summary Judgment Opinion*, 291 F. Supp. 3d at 135–36.  Over the years, the AO disclosed its plans to use EPA fees for each of the expenditure

---

[13]  Annual appropriations legislation generally requires the AO to submit these plans.  *See, e.g.*, Judiciary Appropriations Act, 2010, Pub. L. 111-117, § 304, 123 Stat. 3034, 3177 (2009) ("Within 90 days after the date of the enactment of this Act, the [AO] shall submit to the Committees on Appropriations a comprehensive financial plan for the Judiciary . . . .").

[14]  Citations to "ECF No." are to the district court docket, No. 16-cv-0745 (D.D.C.).

categories contested in this appeal.  J.A. 3090–98.  None of
the appropriations committee responses contained in the
record voiced any objection to the broadened spending of
the judiciary's EPA income on these items.  J.A. 2946 (Sen-
ate Committee on Appropriations FY 2007 Letter);
ECF 81.1, Tabs 14–27.

   The judiciary's formal congressional budget requests
for the relevant period reported both past and anticipated
EPA spending, noting that the EPA program is "funded en-
tirely through user fees."  J.A. 2012.  These budget requests
reflect use of EPA funds for CM/ECF, EBN, Courtroom
Technology, the Mississippi Study, Web-Based Juror Ser-
vices, and VCCA Notification.  J.A. 813, 1372, 1375, 1690,
2014, 2351 (Utilization of EPA Receipts for FY 2009–2015).
And each year, Congress passed judicial appropriations
legislation that neither appropriated taxpayer dollars for
these programs nor expressed opposition to the judiciary's
EPA fee spending.

   In 2009 and 2010, Senator Lieberman did individually
express concerns both to the Judicial Conference and to the
Senate Committee on Appropriations about PACER fees
exceeding the cost of disseminating documents via PACER.
J.A. 2622, 2627.  But in 2011, the Judicial Conference
again raised PACER fees from $0.08 to $0.10 per page, the
rate at which it currently stands.  REPORT OF THE
PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED
STATES 16 (Sept. 13, 2011); ECF No. 73.2 (Skidgel Decl.,
Ex. N).

   From this legislative history, the parties draw opposing
conclusions.  According to plaintiffs, Congress passed the
E-Government Act to halt the judiciary's use of PACER
fees for all non-PACER expenses.  True, the Senate report
regarding the passage of the E-Government Act stated that
its amendment of § 1913 Note reflected a desire to move
the judiciary toward providing more free access to court
records; and the only cited example of overcharging was

PACER. S. REP. NO. 107-174, at 23 (stating that PACER users were being "charged fees that are higher than the marginal cost of disseminating the information"). And we acknowledge that the E-Government Act's sponsor, Senator Lieberman (who supports plaintiffs as an amicus here), has previously expressed the view that the Act limited the use of PACER fees to the direct costs of PACER. J.A. 2622, 2627. But "the views of a single legislator, even a bill's sponsor, are not controlling." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012).[15]

The district court correctly rejected reading the E-Government Act's amendment as injecting a PACER-only limitation onto the fees authorized in § 1913 Note. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 141–42. The statute's text makes no mention of PACER, and—to the extent a committee's description of legislative intent can supply that missing limitation—the Senate Governmental Affairs Committee's mention of PACER as one troubling source of overcharging does not mean that the Committee meant for the amendment to limit PACER fees to PACER costs. Rather, both the literal amendment and the Committee's explanation for it support our view that the limited change worked by § 205(e)—replacing "shall hereafter" with "may, only to the extent necessary"—merely reflects a shift away from mandatory electronic access fees. Thus, plaintiffs fail to persuade us that the E-Government Act amendment means that PACER fees cannot be used to cover CM/ECF and EBN operating costs, as the district court held they could.

---

[15]    We also note that in his brief Senator Lieberman expressly "takes no position on whether, as the district court held, PACER and CM/ECF are so inextricably connected that PACER fees may permissibly be used to support the costs of CM/ECF and [EBN]." Amicus Br. of Sen. Lieberman 11 n.4.

On the other side, the government focuses on the post-amendment congressional budgetary actions and communications as demonstrating the propriety—and indeed necessity—of setting EPA fees high enough to cover all the EPA programs and projects contested in this litigation. But the district court properly rejected this reading, too. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 144.

According to the government, Congress's continued passage of appropriations legislation that did not allocate funds for EPA programs—despite the judiciary reporting its financing of these programs—demonstrate its silent ratification of the judiciary's present EPA financing arrangement. Government's Opening Br. 28–29. The government apparently interprets "only to the extent necessary" as meaning to the extent Congress does not appropriate taxpayer dollars to cover EPA programs. *See* Government's Reply Br. 16–17. We disagree. Although in certain circumstances subsequent appropriations acts may impliedly repeal a pre-existing statutory obligation to pay, *see Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1325–26 (2020); *Belknap v. United States*, 150 U.S. 588, 592–97 (1893), that logic does not extend to cases like this where Congress has never obligated the government to pay anything in the first place. We decline to hold that Congress's failure to appropriate funds for EPA programs imparts any new meaning onto the text of § 1913 Note.

The government's corollary argument based on the appropriations committees' annual letters and emails approving the AO's Financial Plans fares no better. As the district court observed, these communications largely consisted of pro forma, cursory statements of approval or "no objection" to each submitted Financial Plan in its entirety. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 144–45; ECF 81.1, Tabs 14–27. And these appropriations committee responses cannot be taken as expressing the will of Congress as a whole. We will not so lightly abdicate to Congress, or its substituent bodies, the exclusively judicial

power "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Instead, the statutory text and this historical background confirm the district court's understanding of § 1913 Note as limiting EPA fees to providing public access to federal electronic docketing information—and properly covering costs associated only with operating PACER, CM/ECF, and EBN.

First, the overwhelming thrust of the above-cited conference and committee reports is that EPA fees were intended to be spent on creating and increasing access to the federal judiciary's electronic court records and docketing information. *See supra* pp. 19–21 (detailing conference and committee reports authorizing "an experimental program of *electronic access* for the public *to court information*," 1988 JUD. CONF. REP. at 83 (emphasis added), and "reasonable fees for public access *to case information*," S. REP. NO. 101-515, at 86 (emphasis added); urging the judiciary to make court records available electronically for a fee, H.R. REP. NO. 102-709, at 58; and highlighting "electronic case documents, electronic filings, . . . and electronic bankruptcy noticing," H.R. REP. NO. 104-676, at 89). Moreover, the E-Government Act specifically required the judiciary to explore "post[ing] online dockets with links" to all filings and decisions, *see* § 205(d), 116 Stat. at 2915; and the section amending § 1913 Note refers to "[p]roviding [e]lectronic [d]ocketing [i]nformation" in its title, *see* § 205(e), 116 Stat. at 2915. Congress expressly contemplated PACER, CM/ECF, and EBN as it urged the judiciary to expand electronic access to the courts in the late 1990s and early 2000s. The district court properly construed § 1913 Note as authorizing the judiciary to set PACER fees high enough to cover these services providing access to federal electronic docketing information.

Second, this background confirms that the access being provided through the aid of EPA fees authorized by § 1913

Note must be *public* access.  *See supra* pp. 19–21 (describing conference and committee reports, including reports authorizing "an experimental program of electronic access *for the public* to court information," 1988 JUD. CONF. REP. at 83 (emphasis added), and "reasonable fees for *public* access to case information" S. REP. NO. 101-515, at 86 (emphasis added); and supporting efforts to "improve and expand information available in electronic form *to the public*" and urging use of EPA fees to make more information electronically available "to the public," H.R. REP. NO. 104-676, at 89 (emphasis added)).  The E-Government Act overall required use of "Internet-based information technology to enhance *citizen* access to Government information and services."  116 Stat. at 2899 (title) (emphasis added).  And the second sentence of paragraph (a) of § 1913 Note specifically permits distinguishing among classes of users "to promote public access."  Thus, we agree that the fees authorized under § 1913 Note cannot be used to promote access purely for select entities or individuals.

C

Principles of constitutional avoidance further support identifying the above two limitations in § 1913 Note's EPA fee authorization.  But such principles do not lead as far as plaintiffs would have us take them—i.e., to prohibit using EPA fees for CM/ECF and EBN operations.

As their final argument, plaintiffs urge that § 1913 Note must be read narrowly—to authorize PACER fees to cover only PACER costs—in order to avoid two areas of substantial constitutional doubt: (1) that excessive PACER fees may infringe the First Amendment right of access to courts, and (2) that in § 1913 Note, Congress may have unconstitutionally delegated its taxation authority by imposing user fees that go beyond the cost of providing the service for which the fees are charged, *see Skinner v. Mid–Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) (requiring clear indication of intent to delegate this power).

We agree with plaintiffs and amici that the First Amendment stakes here are high. *See generally* Br. of Amici American Civil Liberties Union et al. (discussing the First Amendment right of access to judicial proceedings and records, including via PACER). If large swaths of the public cannot afford the fees required to access court records, it will diminish the public's ability "to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 606 (1982). Such concerns bolster our rejection of the government's more sweeping interpretation of § 1913 Note as permitting EPA fees high enough to cover all electronic access to court information. But we do not foresee the district court's middle-ground interpretation permitting EPA fees to be used for PACER, CM/ECF, and EBN as resulting in a level of user fees that will significantly impede public access to courts.[16] As for the nondelegation concern, we agree with the district court that both the text and legislative history of § 1913 Note demonstrate that Congress adequately authorized the use of EPA fees for more than just operating PACER. *See Summary Judgment Opinion*, 291 F. Supp. 3d at 142–43.

We therefore hold that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information.

V

Applying this interpretation to the contested projects and programs for which EPA fees were used from 2010 to

---

[16]  As to those amici urging the elimination of all fees for accessing electronically available court records, we agree with the government that those calls are better directed to Congress.

2016, we agree with the district court's determination that the government is liable for the amount of EPA fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses.

The Mississippi Study unquestionably pertained to increasing public access to *state* court documents, not to federal court docketing information. *See* Government's Opening Br. 27 (describing the Study as "allow[ing] the *State* to provide the public with electronic access to *its* documents" (emphasis added)). Although the Study was undertaken at the behest of the Senate Committee on Appropriations, *see* J.A. 3154; S. REP. NO. 109-293, at 176 (2006) (urging the judiciary to study the feasibility of sharing CM/ECF technology at the state level), the Study was not an effort to increase access to federal court case information.

Funding the VCCA Notification system through EPA fees was impermissible for a different reason: it only provides access to federal court case information for local law enforcement officers, not for the general public. Though the VCCA Notification system may benefit the public by providing police speedier electronic notifications than awaiting mailed court documents, it does not provide public access.

Using EPA fees to fund E-Juror services and most of the Courtroom Technology category was impermissible for yet another reason: they do not provide access to electronic docketing information. E-Juror provides prospective jurors with electronic copies of documents regarding their jury service, *Summary Judgment Opinion*, 291 F. Supp. 3d at 150; it does not provide access to case-specific filings or other material appearing in a case docket. Likewise, Courtroom Technology funds largely go toward improving the courtroom experience—providing electronic presentations of evidence on flat-screen TVs, for instance—in ways unrelated to providing access to electronic information

stored in courts' CM/ECF docketing system.  We do, how-
ever, agree with the one Courtroom Technology exception
identified by the district court: that EPA fees can be used
to cover expenses related to courtroom "digital audio equip-
ment" used to create digital audio recordings of court pro-
ceedings because these recordings are electronic court
records stored in CM/ECF and made publicly accessible for
download via PACER.  *See Summary Judgment Opinion*,
291 F. Supp. 3d at 150.

Finally, there is one other potential source of liability
not scrutinized by the district court: CM/ECF expendi-
tures.  Based on the limited record before us in this inter-
locutory appeal, it is impossible for us to decide whether all
the costs of maintaining CM/ECF could permissibly be cov-
ered by EPA fees—that is, whether those expenses were
incurred in providing public access to federal court elec-
tronic docketing information.  At oral argument, plaintiffs
suggested that we leave it open to the district court on re-
mand to decide—with the benefit of further argument and
discovery—what portion of expenses in the CM/ECF
"bucket" could be paid with EPA fees.    Oral Arg.
at 11:42–14:00,  http://oralarguments.cafc.uscourts.gov/de-
fault.aspx?fl=2019-1081.mp3.  But the reason the district
court did not scrutinize the CM/ECF line item was that
plaintiffs themselves did not request a "closer examina-
tion" of the expenditures within the CM/ECF category until
after the summary judgment motions hearing.  *Summary
Judgment Opinion*, 291 F. Supp. 3d at 148 n.25.  In light of
this apparent forfeiture, on remand, we leave it to the dis-
trict court's discretion whether to permit additional argu-
ment and discovery regarding the nature of the expenses
within the CM/ECF category and whether EPA fees could
pay for all of them.

## VI

We have considered the parties' remaining arguments
and find them unpersuasive.  We affirm the district court's

statutory interpretation of § 1913 Note.  The case is remanded to the district court for further proceedings consistent with this opinion.

## AFFIRMED AND REMANDED

No costs.